[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried before the Regional Family Trial Docket on a referral from the Stamford Judicial District. The matter was tried over three days. Both parties testified. There was one expert witness, a family services counselor. Several other lay witnesses were heard from. Many exhibits were entered. The court has considered all of the credible evidence presented to it and carefully considered the respective statutory criteria for orders of custody, visitation and access, child support, health insurance, payment of children's health expenditures, alimony, division of the assets and liabilities of the parties and award of counsel fees for the minor children and the parents. It would serve no purpose to separately list that criteria here; it is known and found in the respective statutes. The court makes the following findings and orders.
The court finds that it has jurisdiction over the marriage. One party has lived in the state of Connecticut continuously for more than one year prior to the bringing of this action. The following minor children have been born to the parties since the date of the marriage: Benjamin Ross Hoffman, born September 3, 1986 and Hannah Ross Hoffman January 5, 1990. No other minor children have been born to the wife since the date of the marriage. The parties are not receiving State assistance. The court finds that the marriage between the parties has broken down irretrievably and there is no reasonable prospect for its reconciliation.
The parties were married on June 24, 1984. They have been married 15 years. The plaintiff has retained her birth name throughout the time of the marriage. The plaintiff wife is 48 years old. She is in good health. She has a bachelor's degree and a master's in education. The defendant husband is 52 years old. He is in good health as well. He has a bachelor's degree and a master's degree in Hebrew letters. He is an ordained rabbi, in the Reform movement of Judaism. CT Page 12597
Both parents grew up in Reform Jewish households as children, themselves. The defendant grew up in a household where the congregation his family attended gave him the opportunity to attend synagogue Saturday mornings as well as Friday evenings, and on many of the Jewish holidays. At the time the plaintiff met the defendant her family attended a synagogue that only offered Friday evening services and High Holy Days observances. There is nothing presented in the evidence before the court to suggest that this was not representative of what the plaintiff had been exposed to during her childhood. The parties' pursuits prior to meeting each other are notable. The plaintiff had received her Bachelor's Degree from Syracuse University. She had then, "[d]uring her twenties for a period of about seven years . . . been a cult follower of Maharaji." The cult worshiped him as a god. Then, she was initially held against her will by a deprogrammer, paid for by her parents. She was deprogrammed. Subsequent to that she earned a master's degree in counseling from the Harvard Graduate School of Education in 1981, when she was 30 years old. She met the defendant in 1982.
The defendant received his Bachelor's degree from Johns Hopkins University and his rabbinical masters in 1973 from Hebrew Union in New York. He was ordained as a rabbi in 1973. He served a congregation in Cleveland, Ohio for 4 years and then left it to study for his Ph.D. in the Talmud from Hebrew Union in Cincinnati. He was there for two years completing his course study; he did not finish a dissertation. In 1980, the defendant became a rabbi to a Brooklyn, New York congregation. He stayed there for 5 years. It was 2 years into that job that he met the plaintiff in 1982. He was then 35 years old and been preparing for and pursuing his rabbinical studies and work for in excess of 10 years.
The parties were introduced by Stephen Pearce, a close friend of the defendant's since seminary and the rabbi at the plaintiff family's congregation in Stamford. Rabbi Pearce, who since moved to a San Francisco congregation in the early 1990's, testified before the court. The plaintiff was living in Massachusetts; therefore, theirs was a commuting relationship. Two years after meeting, the parties married; Rabbi Pearce presided over their marriage in his synagogue (and, later, Hannah's naming ceremony). Shortly after their marriage, the defendant accepted a position as the rabbi for a Brookline, Massachusetts congregation. The family moved to Newton where they purchased a house with the CT Page 12598 assistance of an income subsidy from the defendant's employer and with the assistance of funds from the plaintiffs father.
The defendant was the rabbi for the Brookline congregation from 1985 until they moved to Stamford, Connecticut. The defendant left that position for a variety of reasons: they included a philosophical struggle within the congregation as to what direction the congregation should go in regarding the nature of its worship activities, and, to spend more time with Benjamin who had been born in 1986. The defendant decided to pursue a career outside of the rabbinate; this was in furtherance of his goal to find something less demanding on traditional family times. The plaintiffs father had offered the defendant work in the insurance field upon the parties' marriage and the defendant decided to take him up on it. He joined the plaintiff's father and his other two partners in the insurance business. The plaintiffs father structured a variety of business deals and compensation schemes that ultimately resulted in the parties enjoying the ownership of assets and a lifestyle that would not have been available to them solely as a result of the defendant's own income production. This result, whether from generosity or other intended means such as estate planning or tax avoidance, has resulted in this family living beyond the means that the defendant would have provided, and, accumulating assets that his labor alone could not have produced. Through 1997, the plaintiff's father gifted each of the parties $20,000 a year for many years. He also conveyed his and his wife's condominium home in Stamford to the plaintiff. For the time the parties were together, the carrying costs of that were paid to the defendant as additional income and the gift money was utilized as well. The plaintiff, even before the marriage, was named the sole owner of stock in a company he created, JoPaul, Inc. Money is funneled into that company by the plaintiff's father; she does no work for the company but draws income off it as described in her financial affidavit. The company also has a medical reimbursement plan which, as a benefit, pays medical bills of the plaintiff and her family not paid by insurance. It has done so over the years. However, mental health professional bills remain unpaid. They have not been submitted to insurance first because of the defendant's concern about future insurability. While the plaintiff has acquiesced in regard to this in the past, it is a point of disagreement between them now. The plaintiff also has a pension funded for her through JoPaul.
Aside from the income from JoPaul discussed herein, the CT Page 12599 plaintiff is employed as an assistant in the office of the school the children attend. Her income is as recorded on her financial affidavit. Her work hours tailor well to the children's hours of attendance in school. Her skills are those found in a school office. Her work is not full time; presently she receives no benefits. She is also talented musically.
Besides the assets listed below, the plaintiff is the irrevocable beneficiary of a trust created by her father in the principal startup amount of $500,000. (Actually it is one million dollars and she is one half beneficiary and her brother the other beneficiary; she is the contingent beneficiary of his one half if he does not survive her. However, that is not considered here because it is an inchoate interest under Rubin.)
The parties have the following assets for which the court has found values. The marital home is 50 Pine Tree Drive, Stamford. It is jointly held. The court, based on the limited evidence provided regarding the house finds its value to be $385,000, with a mortgage in the approximate principal amount of $183,000. JoPaul stock has a listed book value on the plaintiffs financial affidavit of $77,684. Based on that and the limited evidence provided, the court concludes that it is a shell corporation. Therefore, the book value listed is the value assigned to it by the court. The children have custodial accounts of $137,045, largely from gifts from their maternal grandparents and from presents and appreciation. There is no evidence to suggest that this money has ever been utilized by either parent for other purposes. The parties' bank accounts are as listed on their financial affidavits. The values assigned to their automobiles are as listed on their financial affidavits; it is noted that one is 10 years old and the other a 1997 model. The court finds that the plaintiffs retirement funds are valued at $217,370 and $22,800 respectively for a total of $240,200. The defendant has retirement funds of $901,266. A portion of his rabbinate pension was earned before the marriage. It was paid based on a calculation of 15% of his annual income. His income from the Cleveland and Brooklyn synagogues was $35,000 to $40,000 per year. His income from the Brookline synagogue was about $50,000 per year. Obviously, this fund has also appreciated before and during the marriage; the sums are not vulnerable to a specific determination. The plaintiff has life insurance with cash values of $52,000.00 total. The defendant's whole life insurance is borrowed against to essentially all of its value. Therefore, no value is assigned. The condominium referred to above is found to CT Page 12600 have a value of $220,000 as stated in plaintiffs financial affidavit. It has a $50,000 mortgage and is subject to a life use in plaintiff's parents. The defendant claims a 1/4 interest in Ross Associates, the company where he did business with the plaintiffs father. He also has claims for income owed, and potential liability for income due from him to his former partners. Because of the uncertainties surrounding these claims, and their nature, the court ascribes no value to the ownership claimed and considers the conflicting income claims a wash for the purpose of these proceedings. He owns stock valued at about $1960. The parties each show various liabilities on their respective financial affidavits. The plaintiffs significant debt is to her father. While he has ceased to provide her the $20,000 gift yearly that he provided from 1990 to 1997, he has given her an extraordinary amount of money since the divorce has started, $274,114. She has paid legal fees from this in the amount of $111,000 to Attorney Schoonmaker, her present counsel (which does not include the costs of the trial itself in this matter), and approximately $40,000 to her prior counsel. The plaintiff has utilized the balance of the funds for living expenses since the inception of the divorce proceedings. The plaintiff has not provided any evidence as to how it is expected that these sums will be repaid by her, what the terms of the loans were, whether there has been demand, or, whether they are evidenced by a writing. The plaintiffs only other debt is to her father as well, as shown on her financial affidavit.
The defendant has a list of assorted debts as listed on his financial affidavit. The debt to his father in law is the same debt shown on the plaintiffs affidavit, being a joint indebtedness, both having listed the purpose being for the purchase of the condominium unit. The defendant was ordered to pay the plaintiff $2,200 per month pendente lite. The order was, by clarification, later classified to be unallocated alimony and support. At a pendente lite proceeding, on a motion for contempt brought by the plaintiff, the motion was denied, but an arrearage was found by the court in the amount of $20,500 as of August 23, 1999. No repayment orders were entered by the local court. The entire amount remains due and owing from the defendant to the plaintiff
The court finds that the parties' incomes, as shown on their respective financial affidavits are accurate after consideration of all proper deductions. The evidence discloses no significant prospects for either party to earn appreciably more income in the CT Page 12601 forseeable future. The parties live together at the marital home. That situation cannot continue for long past the grant of dissolution of marriage; it is neither realistic nor is it in the best interest of the minor children. The orders of the court will result in the plaintiff remaining in the marital home if she so desires. Therefore, the attendant costs will be her responsibility. The defendant must find living arrangements that are suitable for him and the minor children when they are in his care. He has been operating his insurance business out of his home and therefore, he will be required to house that as a part of his move as well. Given the time line for Yom Kippur, Succot (both holidays which at least in part include home observances) and Benjamin's impending Bar Mitzvah (October 30), the defendant will need a reasonable period of time to arrange his and his business' move. While the arguing is incessant in the home over the little things, a little while longer should not be too troubling.
The plaintiff seeks a dissolution of marriage. She also seeks sole physical and legal custody of the minor children, and, specifically seeks "the sole authority and decision-making power including decisions regarding issues such issues as education, medical and religion." She specifies that the defendant should have reasonable visitation with the two children. In her testimony she has stated that this means every other weekend, Friday to Sunday, a dinner mid-week and alternating certain holidays and some vacation time. By way of financial relief she seeks the property at 50 Pine Tree Drive in Stamford and an equalization of the parties' assets by way of a transfer of assets to her from the defendants' Keogh plan. The claims for relief do not suggest how the assets nominated in her name but gifted by her family should be treated, or, in fact, whether they should be treated differently than any other of the assets in hers or her husband's name, solely or jointly. She also seeks unallocated alimony and support in the amount of $2250 per month, and an additional sum so designated in the amount of $600 per month for health insurance for the children. Parenthetically, the defendant presently carries health insurance for the children. Notwithstanding the advent of the child support guidelines and the percentage allocation prescribed for unreimbursed expenses, etc., she seeks an order of equal sharing of these sums. Further she seeks certain life insurance orders and a contribution toward legal fees. Finally, she seeks a mutual indemnification order on tax returns and an order for each party to pay their own debts on their respective financial affidavits. There is an arrearage of CT Page 12602 $20,500 due from the defendant to the plaintiff on pendente lite orders and she seeks an unspecified order regarding the same.
By way of relief the defendant seeks joint legal and physical custody of the children, with a detailed proposed parenting plan provided. He seeks no order of alimony for either party. He seeks an order for him to pay $79 per week child support to the plaintiff, representing this to be in compliance with the Guidelines. He requests that the plaintiff be required to carry her own insurance and he continue to carry the children. He, as well, goes down the old, uncorrected road seeking an equal sharing of unreimbursed medical expenses. He would require unpaid medicals first submitted to the JoPaul Medical Reimbursement Plan described above. He seeks an order of a roughly equal share of splitting the parties' assets in accordance with a detailed schedule provided. The schedule provided suggests inclusion of all assets however titled and whether gifted or not. The defendant also offers life insurance for the children and each of the parties to pay their own debts with certain specific exceptions. He also seeks an order of counsel fees, and management of the children's custodial accounts. If required to move, he requests that the order be delayed to account for certain religious holidays and family events.
The minor children have been ably represented throughout these proceedings. (Counsel has billed at the rate of $185 per hour. Her present bill is $5,642.50. The court finds it a reasonable bill given the complexity of the matter, the hours spent on the matter, and the rates charged in the community.) The children's counsel seeks an order of joint custody of the minor children for the parents with primary residence with the mother. The children's attorney specifically seeks that the parents jointly make decisions regarding the health, welfare and religion of the minor children. She provides for the father to have reasonable and flexible visitation with an every other weekend Friday after school until Monday morning schedule, every week Thursday to Friday, and a holiday schedule which includes both secular and religious holidays and a vacation schedule. School vacations and sundry other issues are addressed all consistent with a joint custody arrangement.
The issues surrounding custody are of course governed by the standard of what is in the best interests of the children. Necessarily, this requires a consideration, among other things, of how they have been raised to date, the respective strengths CT Page 12603 and weaknesses of their parents for parenting now and the future, as well as the demonstrated needs of the children.
During the children's early years, the plaintiff was exclusively at home with the children. The defendant was an involved, interested parent around his work. The parties each brought different strengths to the parenting of these children. Neither style conflicted with the other. The conflict before this court is more of an outgrowth of their respective outlooks as adults on the world about them and their respective personal worlds within themselves. They view their place in the world differently. Consequently they view their roles guiding the children to their places in the world differently. While this has created a struggle between them, they have always found a resolution.
Both of these parents have put squarely before this court the issue of their children's religious upbringing, the customs to be observed, and the priority to be accorded it as central to the issue of custody of these children. The plaintiff also urges that the parties cannot communicate nor jointly decision-make on virtually any topic, as well as the extent to which the children's Jewish identity should be fostered. The defendant and the children's counsel urge the court toward an order of joint custody. The defendant protests that the parties historically and presently communicate regularly and have never been unable to come to a joint decision on child-rearing decisions, including most decisions affecting the children's upbringing. While that has been a matter of a difference of opinion, the defendant urges the court to use the children's religious upbringing to date as the template for the decision making in the future on this issue. In many ways, the conflict between these parents on this one issue is a microcosm of the conflict within the Jewish community itself (as well as many other minority religious and secular communities in the United States struggling with the desire to preserve their identity even as they participate in and become a part of the great mix of American society.) Both this mother and this father are strongly committed to their respective personal philosophies on how to be Jewish, and by extension, how to raise children who are Jewish, as a part of both their identities and their spirits. This custodial decision is not and cannot be a referendum on which parent is right. That is neither a proper, nor (frankly) a possible role for the court. While the issues raised by both parents on this issue must be discussed in the context of a custodial order, the considerations for the court to CT Page 12604 entertain, instead, go to those essential to the children's respective best interests: They include considerations of the parents' respective abilities to lend stability, nurturance, insight, support individuation, and parental mutual respect in the children.
The court is convinced that this mother and father can communicate and discuss issues surrounding the upbringing and development of their children. They will have less tension in all of their communications when they are no longer living together and engaging in a continual tug of the need to exercise their respective wills on even the most minute item within their mutual observances. Neither has been exemplary in their conduct of these issues of divorce as it effects their children. The defendant initially provided too much information to the children about the plaintiffs intentions in these proceedings. It is important that he delineate between adult and child issues. His conduct resulted in the children, particularly Hannah having significant and lasting concerns as to her father's well-being as a result of this process. This is not children's business; the children should be calmed and reassured that they will be well and intact with the love of both of their parents and the security of knowing that both of their parents will be fine, regardless of the specific outcome of the proceedings. The defendant's angry behavior in this regard was irresponsible and served to undermine Hannah's security. The court is equally well assured, however, after listening to the taped evidence, that the mother has brought her needs, positions, anger and frustrations to the forefront in front of the children. Listening to Hannah call her mother a liar over the issue of her desire to attend a baby'sbris assures this court that the mother as well as the father have put the children in the middle of this struggle. Further her taping of family conversations openly, and surreptitiously on other occasions, was wrong and improperly involved the children in the legal world of their conflict. The parents need to be separated and parent these two fine children without the constant observation and oversight of the other.
The family service counselor has recommended that this court grant the plaintiff mother sole custody; she further recommends a fairly limited schedule of visitation for the defendant father. The court finds that in this particular evaluation the family services counselor failed to keep the necessary personal distance and professional objectivity from the issues. She expressed to the parties her own religious heritage, the religious practices CT Page 12605 of herself and the religious outlook of herself and her husband. If her expression of her own identity on these issues did not reflect her own view of the plaintiff and the defendant's religious struggle, it served, in any case, to undermine this court's confidence in her impartiality in conducting this evaluation and rendering her opinion. She made little or no effort to communicate with the defendant. She had one meeting with him. She wrote two letters to him. One sought a release of information. When it was not forthcoming, she never sought to find out the reason from the defendant or his attorney. Incredibly, instead, she contacted the plaintiffs attorney and the minor children's attorney on the issue. She adversely viewed the defendant's withholding of the release without considering whether there was a privilege that should be considered in any way. She wrote the defendant once to contact her. He testified that he called her and she had nothing substantive to discuss with him; she denies the phone call took place. However, some attempt at follow-up in even a minimal way would have assured this court that the counselor had any interest at all in communicating with the defendant. When she scheduled visits with the children, she only left messages on the home machine and then faulted the defendant for not being involved. She never made an effort to ascertain if he knew of these visits; she never left a message on the defendant's business phone although she had the number. Instead, without further inquiry she drew an adverse inference to his absence. The counselor also concluded that the defendant made anti-Christian comments. She drew this conclusion from a document supposedly authored by the defendant which was a summary proposal to address the issue of assimilation of American Jews. She received the document by fax from the plaintiff. The counselor never sought to ascertain whether the defendant authored it or what its context was. (Indeed, Rabbi Pearce acknowledged it reflected thinking within the mainstream of debate on this issue among American Jewish leaders and thinkers.) Instead, she referred to it in her testimony as reflecting anti-Christian comments of the defendant.
The counselor's recommendations initially included a recommendation for joint decision making on issues of religion. The week of the trial she decided to change this recommendation to sole decision making on this issue to the plaintiff, after speaking with the children. She never alerted the children's counsel who proposes joint custody, nor defendant's counsel. She did, however, alert the plaintiffs counsel who therefore was prepared for this change in the trial. This is not the conduct of CT Page 12606 a disinterested, objective evaluator. Necessarily, an evaluator such as a family services evaluator relies on statements of others and her own experience in making recommendations. In regard to this family, this evaluator has no credibility before the court and therefore her recommendations are not given any weight in the rendering of this opinion.
The parties have agreed on many things regarding the children: where they should go to school, that Ben should study violin and electric bass and participate in jazz ensemble and that Hannah should study piano. They have agreed historically on all medical issues (except one course of treatment for Ben that was many years ago) including major ones, and who the children's doctor should be. They have not yet discussed where he will attend high school. They have agreed on summer plans for the children, even during the divorce, including space camp, computer camp, and the Creative Summer program for Hannah. They agree where to attend synagogue; neither has moved from their chosen synagogue during the divorce process. They agree on where Hannah's religious education should be pursued. They agree that Ben should have post Bar Mitzvah religious instruction. They do not presently agree on where; the father would leave it up to Ben ultimately and the mother feels the decision should be made by Ben and his parents together. Essentially, their major struggle centers around these kind of issues. These parents differ on what priority should be given to religious events that may conflict with secular events or seem like too much to the plaintiff. The defendant has not forced the children's attendance. Instead he relies on discussion and imploring but not coercion. The choice, he agrees, requires a weighing of considerations. The parties differ on how the scales might tip. What is important to the children is not who prevails. Instead, the children will thrive with whatever decision is made whenever there is a decision to be made, as long as both of their parents support it. In the absence of their ability to agree, the court looks to what historically has been the family practice, that is what has given the children their stability in the past. The children have observed the Sabbath virtually every weekend by services, candles, prayer and dinner. Benjamin has attended services most weekends; Hannah has partaken as well but attended synagogue a little less frequently because of both her age and her preference. This family has observed the holidays listed as major Jewish holidays on the plaintiff's claims for relief each year, missing school as indicated in those claims and attending services and home observances. The evidence is less clear on how strictly the CT Page 12607 so-called minor Jewish holidays have been observed from year to year as the parties' struggle has increased on this issue. The defendant seeks a recognition of the anniversaries of nuclear family deaths as well as birthdays in accordance with the Jewish calendar. Practicality and the stability of a recurring general schedule have been considerations in regard to these issues.
The plaintiff has testified that she does not think that the defendant father wants what is best for these children. This court is concerned that this testimony is a reflection of such a struggle for independence by the defendant that she would seek to undermine him and his access to the children. Her claims for relief seeking such a limited amount of time of the defendant with the children heighten this concern. She seeks to limit his time with the children in part because of his continued `chanting' and Jewish music about the house. Clearly, his musical preference, his prayers in song with the children, and his recitation of Torah portions disturb her mightily. No evidence suggests it has disturbed the children in any way or had any adverse effect on the children, at all. Instead, the prayer and song with the children is a part of their rising and bedtime practices that they have had since they were toddlers. Similarly the defendant's comments to the children that their mother may have emotional problems results only in undermining the children's confidence in her. Notwithstanding much of this, these parents are both loving and capable parents. They can talk together; they do talk together. They can make decisions for their children and will continue to do so jointly as expressed by these orders.
The court orders:
1. A dissolution of marriage.
2. Joint legal custody of the minor children, to take effect upon the earlier of the date provided below for the defendant to vacate the marital home and his actual vacating of the marital home.
Until the date for the defendant's move, or his earlier vacating of the marital home, if he can so arrange, the pendente lite orders regarding care of the children shall continue. They shall cease upon the date for the defendant's vacating the home or his actual vacating of the home, which ever is earlier. CT Page 12608
The parties shall have joint legal custody of the minor children, Benjamin and Hannah. They shall jointly make decisions affecting the well-being of their children. They shall consult each other on all major developmental decisions affecting the well-being of their two children. Each parent shall make the day to day decisions affecting the children while they are in their respective care.
(There are certain issues which are not as likely to be vulnerable to consensus by the parties in the short run as they learn to live with this joint custody order.) Benjamin's post-Bar Mitzvah Judaic studies shall be decided by the parents after consultation with Benjamin. If the parents cannot agree, the decision shall be made by the defendant father. He shall be responsible for all transportation to and from those studies if the plaintiff mother is unable to accommodate her schedule to transport Benjamin when he is in her care. The choice of where Benjamin shall attend high school shall be a joint parental decision.
The following is the general parenting schedule on a four week recurring schedule.
Week one
The mother shall have the children with her: Sunday through to school Thursday (except the father's time Tuesday).
The father shall have the children with him: Tuesday after school through dinner; and after school Thursday through to school the following Monday (of week two).
Week two
The mother shall have the children with her: after school Monday through to school Friday morning.
The father shall have the children with him: continued from week one, Sunday through to school Monday morning; and after school Friday through to school the following Monday morning (of Week three).
Week three
The mother shall have the children with her: after school CT Page 12609 Monday through to school Thursday morning.
The father shall have the children with him: from week two, Sunday through to school Monday morning; and after school Thursday through to school the following Thursday morning (of week 4).
Week four
The mother shall have the children with her: after school Monday for dinner Monday evening; and then after school Thursday through to the following Thursday (of week one).
The father shall have the children with him: from week three, Sunday through to school Thursday (except the mother's Monday time).
If Monday is a secular holiday with no school, it shall be spent with the mother, in accordance with the following holiday schedule. The secular holiday parenting schedule shall be as follows, and it shall supercede the general schedule but not the major Jewish holiday schedule.
Each year, the mother shall have the children with her on Labor Day, Mother's Day, Father's Day (so long as her father is alive, otherwise this day shall be the defendant's), Memorial Day, Fourth of July, Columbus Day (if no school), the mother's civil birthday, and Thanksgiving Day from noon until 3 p. m. the next day (they shall be with the father that morning), unless it is week four on the cycle.
The Jewish holiday parenting schedule shall be as follows, and it shall supercede the general schedule and the secular holiday schedule.
Rosh Hashanah, Yom Kippur: the children shall be with the mother in even numbered years, and with the father in odd numbered years, from after school of the day of the evening of the commencement of the holiday to noon of the day of the holiday; and with the mother in odd numbered years, and with the father in even numbered years, from noon of the holiday until 9 p. m.
The evening of holidays of Sukkot/Shemini Atzaret and Hanukkah shall be divided, the first four to the plaintiff in even numbered years and the second four to the plaintiff in odd CT Page 12610 numbered years; and the reverse for the defendant. This schedule shall be for the time after school through the evening dinner.
Purim, Shavout: Purim shall be the plaintiff's holiday with the children in odd numbered years; Shavout shall be the plaintiff's holiday with the children in even numbered years. The reverse shall be the defendant's time with the children on these holidays. The holiday access shall be from after school of the evening of the holiday to the conclusion of services of the day of the holiday as they may be held during and after school.
Pesach: The parties shall alternate the first evening and day, and, the second evening and day, such that the first shall be with the mother in even numbered years and the second with her in odd numbered years and the reverse for the father. These evenings shall commence after school and run overnight to school the following morning, or as the general schedule provides if it is a weekend. The balance of the days of the holiday shall follow the general schedule.
The balance of the Jewish holidays shall follow the general schedule. The parent observing a yahrzeit for a deceased family member may take the children to synagogue for one service on that anniversary unless the children are out of state on a vacation.
The parents shall each be entitled to have the children with them for the dinner hour on one celebration of their own birthday (civil or religious at their option). The father is entitled to celebrate the children's religious birthdays with them after school through dinner; the mother is entitled to celebrate the children's civil birthdays with them after school through dinner. This provision supercedes the general schedule.
The parents are entitled each to two non-consecutive weeks during the summer that do not conflict with summer camps; they must give a minimum of two weeks notice. The parents shall divide equally the school vacation time, each having, if it is available, one week in December and one week in March.
No designation of primary residence is made under this parenting schedule.
3. The child support guidelines provide for support amounts from each party of $197 per week from the defendant plus $650 per month for health insurance and $165 per week from the plaintiff. CT Page 12611 The court deviates based upon shared custody. The reasoning of the guidelines that the court must still make further determinations of threshold issues before deviation do not apply here. There is no primary custodian as between these two parents. The court orders the defendant to pay child support in the amount of $75.00 per week commencing on his vacating the home.
4. The defendant is ordered to maintain health insurance for the benefit of the minor children unless the same shall become available to the plaintiff through her employment. The party maintaining the insurance shall pay 40% of medical bills not paid by insurance, after submission to JoPaul for reimbursement under the plan. The other party shall pay the balance of 60%. This is a deviation from the Guidelines based on shared custody and the existence of the JoPaul Reimbursement plan.
5. The defendant carries certain life insurance on his life, which is thoroughly borrowed against. He is ordered to maintain the $825,000 term life insurance for the minor children during the period of the children's minority. The plaintiff is ordered to maintain the life insurance she currently has for the benefit of the minor children. There are no issues of insurability and the court finds all relevant premiums affordable.
6. The defendant is ordered to pay the arrearage of $20,500 on or before December 31, 1999, in its entirety.
7. There shall be no alimony to either party.
8. The defendant is solely responsible for the debts on his financial affidavit, except the debt to his father-in-law. The plaintiff shall indemnify him and hold him harmless on that obligation. The plaintiff is solely responsible for the liabilities listed on her financial affidavit.
9. Until the defendant vacates the family home, he shall pay the plaintiff $150 per week toward the living expenses of the home and shall contribute groceries of not less than $100 per week toward the home. These sums are not to be considered as taxable income for the plaintiff The payments shall commence immediately. If he fails to make these payments, it shall be cause for the defendant to be immediately ordered to vacate by the court. Payments shall be made in arrears and food purchased in advance for each week. CT Page 12612
10. The defendant shall vacate the marital home on or before November 30, 1999.
11. The defendant shall by quit claim deed convey all of his right, title and interest in and to the marital home to the plaintiff within 30 days of this decree. She shall indemnify him and hold him harmless from all obligations thereon including the mortgage.
12. The plaintiff shall be the sole owner free and clear of any claim of the defendant of the following assets: the Hoyt Street condominium unit, the 1997 Honda motor vehicle, the marital home, all of the stock ownership in JoPaul, Inc., her interest in the JoPaul deferred compensation plan, her IRA, her trust interest, and bank accounts titled in her name including the First County account.
The defendant shall be the sole owner free and clear of any claim of the plaintiff of the following assets: his rabbinate pension, his Keogh plan, his 401k plans, his IRA and his SEP. his bank accounts titled in his name at People's Bank and his life insurance policies (for which he is responsible for the loans), and, his Equitable stock.
The defendant is the sole owner of any assets recovered by him as a result of his employment at Ross Associates, including any recovered ownership interest therein, and, he is solely responsible for any liabilities arising out of claims against him from those matters.
13. No attorneys fees are awarded to plaintiff's or defendant's counsel. To do so would destroy this crafted financial mosaic. Further, neither party's means to personally pay their own fees can be extended to the other's fees; the resources are not available. Further, this court cannot, based on the evidence presented, find that the plaintiffs counsel fees are reasonable. The court is not suggesting that they are not, simply that information has not been provided in the context of this case for the plaintiff.
14. The minor children's attorney fees have been, to date, split evenly by the parties. The court must look to the resources of the children to pay their own fees. These resources are ample. Each children's funds are to pay one-half of Attorney Barnett's fees, within 30 days. CT Page 12613
15. The titled trustee, custodian, or fiduciary of these accounts shall continue to hold them; their management shall be as has been practiced in the past.
16. To the extent that the court has the authority to issue orders regarding the allocation of dependency exemptions for tax purposes, the father shall claim Benjamin and the mother shall claim Hannah. This provision is separable from the other financial orders and did not form a basis for those orders; instead they formed the basis for this order.
17. Each party is the owner of their own personal effects. They shall attempt to come to agreement as to ownership of their personal furnishings. As to the items, if any, that there is no agreement on, they are ordered sold and the proceeds divided equally.
It is so ordered.
By the court,
Munro, J.